CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

FEB 0 6 2020

JULIA C. DUDLEY, CLERK
BY: ~~Slagle~~
DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### ROANOKE DIVISION

| | |
|---|---|
| S. TRAVIS SHREWSBURY, et al., ) | |
| ) | |
| Plaintiffs, ) | Civil Action No. 7:18cv467 |
| v. ) | |
| ) | |
| DAVID F. WILLIAMS, ) | By: Hon. Michael F. Urbanski |
| ) | Chief United States District Judge |
| Defendant ) | |

## MEMORANDUM OPINION

Travis Shrewsbury and Waneta McKinney filed this lawsuit on September 19, 2018, alleging that defendant David F. Williams violated their rights under the common law of the Commonwealth of Virginia and also under the Fourth Amendment to the United States Constitution when he pursued criminal charges against them without probable cause. They seek relief under the common law and also pursuant to 42 U.S.C. § 1983.

Pending are Williams's motion for summary judgment, ECF No. 54; Shrewsbury and McKinney's motion for summary judgment, ECF No. 56; and plaintiffs' motion to strike a declaration filed with Williams's reply to their response to his motion for summary judgment, ECF No. 67. As discussed more fully below, Defendant Williams's motion for summary judgment is **GRANTED**; plaintiffs' motion for summary judgment is **DENIED**; and plaintiffs' motion to strike is **DENIED as moot**.

# BACKGROUND[1]

## I. Allegations of Dog Theft

In early May 2017, Daykota Pritt's hunting dog, a Walker Hound, got loose and disappeared. Pritt searched the area for the dog and learned that the dog had been picked up by an animal control officer. (Deposition of Daykota Pritt, ECF No. 57-7 at 16-17). Pritt went to the Alleghany County Humane Society ("the shelter") to look for the dog. (Id. at 17). Upon arrival, he went inside and asked if there were any hounds at the shelter. The women who were working in the front office told him that they did not have any hounds at the shelter, and tried to "shoo" Pritt out the door. The dogs in the shelter were barking and Pritt believed that he could hear his own dog barking. He believed that the women at the shelter were lying, but because he did not want to lose his temper, he left. (Id. at 10-11).[2]

Two or three days later, an officer contacted Pritt's girlfriend and told her that Pritt's dog was at the shelter. (Id. at 19). Pritt returned to the shelter, where he was met by Alleghany County Sheriff's Deputy Todd Ailstock, who told him that the dog had been picked up five days earlier. (Id. at 19; Deposition of Todd Ailstock at 17-18; ECF No. 65-2 at 6-7). Pritt went to the shelter, identified the dog, and the dog was released to him. (Pritt Depo., ECF No. 57-7 at 9-21). According to Pritt, Ailstock told him that the shelter staff had lied to him, because it was clear that they were holding a hound when Pritt went to the shelter the first time. (Id. at 21).

---

[1] The facts are taken from the depositions of parties and witnesses, and from transcripts of a preliminary hearing and a bench trial, both of which arose during the criminal proceedings on which plaintiffs' causes of action are based.

[2] Virginia Code Section 3.2-6546(B)(3) provides that "If a person contacts the public animal shelter inquiring about a lost companion animal, the shelter shall advise the person if the companion animal is confined at the shelter or if a companion animal of similar description is confined at the shelter."

Ailstock, who serves as the animal control officer for the county, testified that he picked up the dog, later identified as Pritt's hound, on May 1, 2017. The dog was not wearing a collar, but had a ring around its neck that showed it had previously worn a collar. (Tr. of hrg. held on Oct. 17, 2017, ECF No. 57-5 at 5). Ailstock took the dog to the shelter and told the acting shelter manager, Brittany Gilbert, that the dog clearly had worn a collar recently. He asked that the dog be put on a 10-day hold (Id.)[3]

Ailstock was out of town and away from the shelter from May 11 through May 14, 2017. When he walked through the shelter on May 15, 2017, he was surprised to see that Pritt's dog was still there, because a few days prior to going out of town he had received a call from the Sheriff's Office telling him that someone was looking for a dog matching the description of Pritt's dog. (Id. at 6-7, 10). Ailstock asked the shelter staff why the dog was still there and Heather Craig Tucker and Alexa Nininger told him that Pritt and his girlfriend had been to the shelter to claim the dog but had been told that the dog was not there. (Ailstock Depo. at 14-15; ECF No. 65-2 at 6). That same day, Ailstock was able to contact Pritt, who retrieved the dog from the shelter. (Tr. of hrg. held on Oct. 17, 2017, ECF No. 57-5 at 7). Ailstock noted that the dog appeared to be healthy, except for a cut on his right rear leg, which was healing. The shelter staff had taken the dog to the vet, but Ailstock did not know why they had done so. (Id. at 8-9).

---

[3] Pursuant to Va. Code § 3.2-6546 (C), the shelter must hold an animal for a minimum of five days, not counting the day on which the animal arrives at the shelter. The shelter must make a reasonable effort to ascertain whether the animal has a collar, tag, license, tattoo, or other form of identification, and if such identification is found on the animal, the animal shall be held for an additional five days. Under § 3.2-6546 (D), if an animal confined pursuant to this section has not been claimed upon expiration of the appropriate holding period, it shall be deemed abandoned and become the property of the shelter.

Based on his conversation with the shelter staff, Ailstock contacted the Commonwealth attorney for Alleghany County to inquire about the legal liability of the shelter because the dog was still under the Alleghany County hold period when Pritt first tried to retrieve him and was told the dog was not there. (Ailstock Depo. at 16-18; ECF No. 65-2 at 6-7). The next day, Ailstock met with the Edward Stein, the Commonwealth's Attorney, and with the Assistant Commonwealth'a Attorney, who advised that he should not personally conduct an investigation because he worked with the shelter staff on a daily basis. The attorneys advised him to refer the matter to defendant, David Williams, an investigator with the Alleghany County Sheriff's Office, and Ailstock did so. (Id. at 19-20; ECF No. 65-2 at 7). When Ailstock contacted Williams, he told him that Pritt had complained that when he tried to retrieve his dog, it was not returned to him. Ailstock also told Williams that shelter staff had information about the incident, although he did not tell Williams what the staff had told Ailstock. (Id. at 19; ECF No. 65-2 at 7).

Plaintiff Waneta McKinney has been a volunteer member of the board of directors of the Alleghany County Humane Society for many years. Her duties include helping with fundraising, writing grant requests, marketing events and animals, networking with rescue partners, assisting the staff as needed, purchasing, and transporting animals as needed. (Deposition of Waneta McKinney, ECF No. 57-3 at 12-14). Kennel attendants at the shelter report directly to the board, although at times there has been an executive director to oversee day-to-day operations at the shelter. (Id. at 15-16). Trisha Deaton was the executive director at the shelter from June 2017 until September 2017. (Id. at 17-18). Brittany Gilbert was the executive director of the shelter in May 2017.

4

At some point in May 2017, McKinney became aware that a Walker Hound had come into the shelter. Walker Hounds and Pit Bulls are the most common breeds that come into the shelter and the board focuses energy on marketing the breeds and working with dog rescue groups to place them. (Id. at 21-23). With regard to Pritt's dog, the shelter staff told McKinney that they had taken the dog to the veterinarian and it appeared that the dog had been kept in the type of box that is used in the back of a pickup truck to transport dogs, and he had some physical ailment related to that. (Id. at 24). McKinney was at the shelter when Pritt arrived and asked about his dog. She did not hear any conversation between Pritt and shelter staff and had not told shelter staff to not return the dog to him. (Id. at 30-33).

On May 16, 2017, McKinney learned that Ailstock had returned the dog to Pritt on the evening of May 15, 2017. Prior to that, she was not aware that Pritt owned the dog, did not know Pritt, and had no opinion as to his reputation with regard to dogs. (Id. at 25-26). It was McKinney's understanding that a dog without identification would be held for approximately one week and a dog with identification would be held for ten days. (Id. at 27). McKinney talked to the Bath Animal Welfare Foundation about taking Pritt's dog because they have a good record of finding homes and have a network of foster homes where people can give dogs individual attention. (Id. at 28-29).

On May 16 or 17, 2017, Gilbert told the board that an investigation was being conducted into what happened with Pritt's dog. McKinney knew that the facility had video of Pritt's first visit to the shelter and she contacted either Ailstock or Williams to tell them about the video. (Id. at 30-33). McKinney was not aware that Pritt had gone to the shelter to look for the dog until Gilbert notified the board about the investigation. (Id. at 32).

5

Williams went to the shelter on May 17, 2017 to view the video and talk to McKinney. She told him what she knew about what had happened that day and also told him to talk to Gilbert, who was at the shelter the day Pritt went there to look for the dog. (Id. at 34-35). McKinney had one other conversation with Williams, when she told him that Ailstock had been telling the employees at the shelter that McKinney and another person were going to be indicted for a felony for stealing the dog. Williams said he would look into it. (Id. at 36).

Williams testified that according to McKinney, after the dog became the property of the shelter, she sent a message via Facebook messenger telling another board member, Melissa Lawrence, to keep the dog away from the public. The text of the message read:

> After hearing [the dog's] sad story, and now that his hold is over, I reached out to BAWF to see if they would take him and get him out of the area. They are working on it. We'll keep you posted. Please keep him away from the public so no one sees him and recognizes. Thank you.

(Tr. of Prelim. Hrg., ECF No. 57-5 at 20). McKinney said that she sent the message because their information was that the dog had been kept in a box in the back of the truck and that was a sad thing to hear. It is unclear on what date the message was sent. (McKinney Depo., ECF No. 57-3 at 39-40). McKinney said that it was her intention to place the dog with a rescue organization where he would be in better circumstances. (Id. at 40). McKinney stated that she did not know if, at the time Pritt first went to ask about the dog, the dog was still within the ten-day hold period. (Id. at 45). However, McKinney said it was her understanding that Tucker lied to Pritt about his dog being in the shelter because she felt pressure from Lawrence to do so. (Id. at 44).

Defendant Williams stated in his deposition that he recorded interviews with McKinney and the employees at the shelter, including Lawrence, Lawrence's daughter, Rachel,

6

Tucker, and Nininger. He gave copies of the recordings to Edward Stein, the Commonwealth'a Attorney for Alleghany County. Williams stated that Tucker and Nininger told him that when Pritt first appeared at the shelter asking about his dog, they told him that the dog was not at the shelter, even though it was. Nininger said that McKinney and Lawrence had instructed them to say that. (Williams Depo., ECF No. 57-10 at 18-19, 22, 52-53).

Stein, as the Commonwealth attorney, has preliminary review of cases that go in front of the grand jury and if someone brings him a case that he does not think should go before the grand jury, he does not present the case. (Deposition of Edward Stein at 69; ECF No. 63-4 at 19). Stein placed the dog theft indictment on the grand jury list because he believed a crime had been committed. (Stein Depo. at 22; ECF No. 63-4 at 8). Williams testified to the grand jury about the theft, telling them about his conversations with shelter employees, the statement from Ailstock, and the message McKinney gave to the shelter employees. (Williams Depo., ECF No. 57-10 at 38, 46-48).

The grand jury failed to return a true bill. Stein stated in his deposition that he was called into the grand jury room because the jurors had a question. More than one juror felt he or she had a conflict of interest because they either knew McKinney or had volunteered at the shelter. Stein told them that if they felt they were biased and could not make a fair decision, they should abstain. (Stein Depo. at 29-31; ECF No. 63-4 at 9-10). When the grand jury made returns, there were not enough affirmative votes for a true bill on the charges against

McKinney and Lawrence, and the indictments against them were returned as not true bills. (Stein Depo. at 31-32; ECF No. 63-4 at 10).[4]

Despite the grand jury not returning a true bill, Stein decided to go forward and proceed against McKinney and Lawrence by warrant. He discussed the case with Williams, who obtained arrest warrants for McKinney and Lawrence. (Stein Depo. at 34-36; ECF No. 63-4 at 11; Williams Depo., ECF No. 57-10 at 44). Williams testified that it is the policy of Alleghany County that the Commonwealth's Attorney may direct a deputy in an investigation. (Williams Depo., ECF No. 57-10 at 44-45).

Williams presented the information he had to an Alleghany County magistrate, telling him that Ailstock picked up a lost dog and took it to the shelter. (Id. at 46-47). He told the magistrate that two shelter employees, Tucker and Nininger, told Williams that McKinney and Lawrence had instructed them not to return the dog to its owner, Pritt. A few days later, Ailstock returned to the shelter with Pritt, and released the dog to him. (Id. at 47-48). The magistrate signed arrest warrants for McKinney and Lawrence. (Id. at 45).

In July 2017, McKinney heard that board member Lawrence had been arrested. After calling the Sheriff's Office and learning that a warrant had been issued for her own arrest, McKinney turned herself in at the Sheriff's Office. She was charged with stealing a dog and conspiring to steal a dog belonging to Daykota Pritt. (Id. at 47-48; arrest warrants, ECF Nos. 57-1 and 57-2).

---

[4] Plaintiffs argue that the information that the grand jury did not return a true bill because some members abstained is hearsay and not admissible on summary judgment. See Evans v. Technologies Applications & Service, Co., 80 F.3d 954, 962 (4th Cir. 1996) (noting that summary judgment affidavits cannot be based on hearsay). However, Stein's testimony is considered not for the truth of the matter asserted, i.e., that some members abstained from voting because they knew McKinney, but only for the fact that Stein had a discussion with them and told them to abstain if they could not be fair.

McKinney was not aware of any animus that Williams might have had toward her prior to May 2017. However, his involvement in the actions taken toward her after that led her to believe he harbored animus toward her. (McKinney Depo., ECF No. 57-3 at 52).

A preliminary hearing was held in the General District Court for Alleghany County on the dog theft charges on October 5, 2017. McKinney and Lawrence appeared and were represented by counsel. Stein represented the Commonwealth. Although Daykota Pritt was subpoenaed to appear, he did not appear.[5] At the end of the hearing, the court stated, with regard to the charges brought against McKinney and Lawrence, and in commenting upon Va. Code § 3.2-6546:

> I agree with you, [counsel for Lawrence], there's no evidence of – here's what troubles me.
> I've been a judge a long time. I think this conduct is unfortunate, but this doesn't seem like a felony to me. This Court, for historically the district court – and I think very highly of district court – it keeps – it looks at cases and at probable cause. But also, over the years, I've sort of looked at fundamental – there were mistakes here. There may even be civil liability for some of the mistakes.
> But I have a hard time – I mean, at the most, it would be a trespass to a chattel, potentially. But this statute, I mean, it says what it means. And it changes that ownership of an abandoned dog. And I can understand why, because you can't ask these people to run shelters and keep dogs forever.
> It just doesn't seem right that these people should stand trial for a felony. I'm going to adopt the interpretation of the statute.
> I'm going to discharge them.
> If the Commonwealth is so advised, they can indict. But I don't think it's worthy of a felony trial. There might be other remedies – I can think of some of them, but I don't think it's right to make these ladies stand trial.

(Tr. of Prelim. Hrg., ECF No. 57-5 at 30-31). Thus, the court dismissed the dog theft charges against McKinney and Lawrence.

---

[5] In his deposition, Pritt said he did not appear at the hearing because he had a lot going on in his life and he forgot about it. He also said that because he had his dog back, he did not care "what happened or what they did to that woman." (Pritt Depo., ECF No. 57-7 at 25-29).

## II. Allegations of Obstruction of Justice

In the meantime, two shelter employees, Nininger and Tucker, complained to Ailstock that they believed they were being harassed at the shelter, and that the harassment stemmed from statements they had made to Williams about the dog theft case. Ailstock told them that he was no longer investigating the case and if they had concerns, they needed to discuss them with Williams. (Ailstock Depo. at 21-23; ECF No. 65-2 at 7-8).

Tucker called Williams and told him that during the time of the dog theft investigation, she was asked to be interviewed by an investigator hired by the attorney representing McKinney. Tucker told plaintiff Shrewsbury, who is married to plaintiff McKinney, that she did not want to talk to the investigator. Shrewsbury told her that she had no choice but to speak to the investigator and that her job depended on it. (Williams Depo., ECF No. 57-10 at 80-81).

Additionally, executive director Trish Deaton had told Williams that McKinney had told Deaton to discipline Tucker with the intention of causing Tucker to lose her job. Williams advised her to talk to Stein, and it is Williams's belief that she went to Stein's office and talked to him about her concerns. (Id. at 81-82). According to Williams, a couple of weeks later, Stein asked Williams to obtain misdemeanor warrants against McKinney and Shrewsbury for obstruction of justice, a violation of Virginia Code Section 18.2-460. (Id. at 82).

Stein stated that he did not conduct an investigation into the obstruction of justice allegations and to the best of his knowledge, Williams conducted the investigation. (Stein Depo. at 56; ECF No. 63-4 at 16). However, Stein agreed that as Commonwealth's Attorney, he was the chief law enforcement officer for Alleghany County and that he had the authority

10

to make final decisions to determine whether a prosecution should go forward. (Stein Depo. at 67; ECF No. 63-4 at 19). Stein further stated that he had more than one conversation with Williams regarding the complaints about harassment from Tucker and Nininger. (Stein Depo. at 71; ECF No. 63-4 at 20). In response to a question asking whether it was Williams's idea or Stein's idea to have a magistrate decide whether there was probable cause, Stein said, "It was a collaborative effort and I can't tell you . . . whose idea it was." (Id.) He added that he was aware that Williams was going to seek warrants from the magistrate and did not object to or oppose Williams's decision to seek warrants. (Stein Depo. at 71-72; ECF No. 63-4 at 20).

The magistrate issued arrest warrants for obstruction of justice against Shrewsbury and McKinney on September 21, 2017. They live in West Virginia and Williams called them but did not leave a message because he did not want anyone to overhear the message. (Williams Depo., ECF No. 57-10 at 83-84). Stein stated that the warrants were not served until the October 5, 2017 hearing because "we knew where Mr. Shrewsbury and Ms. McKinney would be in a week or so." (Stein Depo. at 56-57; ECF No. 63-4 at 16). He added that it was not his decision to serve the warrants at that time, but he and Williams "may have discussed that that was [Williams's] intent." (Stein Depo. at 57; ECF No. 63-4 at 16).

Williams stated that after the October 5, 2017 hearing where the dog theft charges were dismissed, he asked Stein if Stein intended to "nolle pros" the obstruction of justice warrants, which Williams fully anticipated he would do. Stein responded that he wanted them served immediately. Williams then asked Shrewsbury and McKinney to go with him and Stein told them that they needed to accompany Williams. Williams did not handcuff them but escorted

them to the magistrate where they were processed and released. (Williams Depo., ECF No. 57-10 at 88-89).

McKinney stated that when Williams arrested her after the October 5, 2017 hearing, he looked very angry and the situation was very uncomfortable as he escorted her from the courthouse to the Sheriff's Office. He did not go in through the front of the facility, but went around took them in through a dimly lit, crowded garage. She found it scary and uncomfortable and said Williams was visibly angry from the expression on his face. (McKinney Depo., ECF No. 57-3 at 52-53).

A bench trial was held on the misdemeanor obstruction charges in the general district court of Alleghany County on December 7, 2017. (Trial Tr., ECF No. 63-1). Shrewsbury and McKinney were represented by counsel and Stein represented the Commonwealth. At the close of the Commonwealth's case, Lawrence's attorney moved to strike. (Trial Tr., ECF No. 63-1 at 66). The court denied the motion. (Trial Tr., ECF No. 63-1 at 71-72).

After evidence and argument, the court commented that aspects of the case were troubling, particularly the interplay between the board and the executive director. Nevertheless, the upon evaluating the evidence and the demeanor of the witnesses, the court could not find beyond a reasonable doubt that Shrewsbury and McKinney obstructed justice and dismissed the charges against them. (Trial Tr., ECF No. 63-1 at 110-112).

**III. Search Warrant**

On October 5, 2017, the same day as the hearing on the felony dog theft charges, Williams prepared an affidavit stating that Deaton, the former executive director of the Alleghany Humane Society, had told him that "the bank account and the records in the office

12

showed a $14,000 difference" and that emails between the director and board members "indicat[ed] a $25,000 difference." He requested a search warrant in relation to the offense of embezzlement under Va. Code § 18.2-111. He asked that the warrant include access to the humane society's computers, records, papers, files, and bank accounts. (Warrant, ECF No. 57-8 at 3). The search warrant was issued the same day. (ECF No. 57-9 at 2).

Ailstock stated that prior to Deaton's resignation, she told him she needed to speak to someone about what she believed was a difference in the amount of money in the shelter bank account and the amount of money in the books. Ailstock advised her to talk to Williams, because it was Ailstock's understanding that he was not to investigate matters pertaining to the shelter because he worked closely with shelter staff. (Ailstock Depo. at 37-38; ECF No. 65-2 at 11-12).

Williams was shocked that he was asked to obtain the search warrant on the same day as the preliminary hearing on the dog theft charges. (Williams Depo., ECF No. 57-10 at 72-73). Stein stated that he and Williams had discussed the search warrant. Stein's understanding was that there was an issue of a $25,000 discrepancy between the accounting records and the bank account. Contrary to Williams's assertion, Stein said that he did not direct Williams to obtain the search warrant, and the direction to obtain the warrant would have come from someone in the Sheriff's Office. (Stein Depo. at 53; ECF No. 63-4 at 15). According to Stein, it was Williams's idea to execute the search warrant during the hearing because there would be fewer people at the shelter, which would reduce the chance of confrontation. (Stein Depo. at 54; ECF No. 63-4 at 16).

13

Another officer, Richard Fridley, executed the search warrant while McKinney was in court. (Williams Depo., ECF No. 57-10 at 77). The investigation was conducted by the Virginia State Police and the Alleghany County Sheriff's Office had no further involvement. A Virginia State Police officer went to the Sheriff's Office and took the items the Sheriff's Office had removed from the shelter. (Id. at 67). Williams later was informed that it was determined that there was no indication that any illegal activity had occurred. (Id. at 27-28). It took several months for the shelter to get the seized items returned, and they were forced to buy new computers in the interim.

## IV. Causes of Action and Motions for Summary Judgment

Plaintiffs assert a Virginia common law cause of action for malicious prosecution and a Fourth Amendment malicious prosecution cause of action against Williams. They seek compensatory and punitive damages. Plaintiffs do not to assert a cause of action based on the search warrant, but argued at the hearing that the fact that Williams sought the search warrant was evidence of his malicious animus toward McKinney and Shrewsbury.

In Williams's motion for summary judgment, he argues that he had probable cause for the arrest warrants against McKinney for larceny of a dog and against McKinney and Shrewsbury for obstruction of justice. He also argues that even if he violated McKinney's and Shrewsbury's constitutional rights by seeking the warrants, he is entitled to qualified immunity.

In McKinney and Shrewsbury's motion for summary judgment, they argue that they have set forth evidence showing that Williams is liable for malicious prosecution under state common law and the federal Constitution because he lacked probable cause to seek the arrest warrants and is not entitled to qualified immunity.

14

## DISCUSSION

### I. Standard of Review

This case is before the court on cross-motions for summary judgment. "When cross-motions for summary judgment are before a court, the court examines each motion separately, employing the familiar standard under Rule 56 of the Federal Rules of Civil Procedure." Desmond v. PNGI Charles Town Gaming, L.L.C., 630 F.3d 351, 354 (4th Cir. 2011).

Pursuant to Rule 56(a), the court must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986); Glynn v. EDO Corp., 710 F.3d 209, 213 (4th Cir. 2013). When making this determination, the court should consider "the pleadings, depositions, answers to interrogatories, and admissions on file, together with . . . [any] affidavits" filed by the parties. Celotex, 477 U.S. at 322. Whether a fact is material depends on the relevant substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Id. (citation omitted). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323. If that burden has been met, the non-moving party must then come forward and establish the specific material facts in dispute to survive summary judgment. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586–87 (1986).

In determining whether a genuine issue of material fact exists, the court views the facts and draws all reasonable inferences in the light most favorable to the non-moving party.

15

Glynn, 710 F.3d at 213 (citing Bonds v. Leavitt, 629 F.3d 369, 380 (4th Cir. 2011)). Indeed, "[i]t is an 'axiom that in ruling on a motion for summary judgment, the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.'" McAirlaids, Inc. v. Kimberly–Clark Corp., 756 F.3d 307, 310 (4th Cir. 2014) (internal alteration omitted) (citing Tolan v. Cotton, 134 S. Ct. 1861, 1863 (2014) (per curiam)). Moreover, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." Anderson, 477 U.S. at 255.

The non-moving party must, however, "set forth specific facts that go beyond the 'mere existence of a scintilla of evidence.'" Glynn, 710 F.3d at 213 (quoting Anderson, 477 U.S. at 252). The non-moving party must show that "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Res. Bankshares Corp. v. St. Paul Mercury Ins. Co., 407 F.3d 631, 635 (4th Cir. 2005) (quoting Anderson, 477 U.S. at 249). "In other words, to grant summary judgment the [c]ourt must determine that no reasonable jury could find for the nonmoving party on the evidence before it." Moss v. Parks Corp., 985 F.2d 736, 738 (4th Cir. 1993) (quoting Perini Corp. v. Perini Constr., Inc., 915 F.2d 121, 124 (4th Cir. 1990)). Even when facts are not in dispute, the court cannot grant summary judgment unless there is "no genuine issue as to the inferences to be drawn from" those facts. World-Wide Rights Ltd. P'ship v. Combe Inc., 955 F.2d 242, 244 (4th Cir. 1992).

The cross-motions in this case both address the issues of probable cause and qualified immunity. The court will examine defendant's motion first and construe fact issues in favor of plaintiffs.

16

## II. 42 U.S.C. § 1983

To prevail on a claim for a civil rights violation under 42 U.S.C. § 1983, a plaintiff must establish (1) that he has been deprived of a right, privilege or immunity secured by the Constitution or laws of the United States and (2) that the conduct about which he complains was committed by a person acting under color of state law. <u>Dowe v. Total Action Against Poverty in Roanoke Valley</u>, 145 F.3d 653, 658 (4th Cir. 1998).

The doctrine of qualified immunity affords protection against individual liability for civil damages to officials insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. <u>Pearson v. Callahan</u>, 555 U.S. 223, 231 (2009) (quoting <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982)). Stated another way, "[q]ualified immunity protects officials 'who commit constitutional violations but who, in light of clearly established law, could reasonably believe that their actions were lawful.'" <u>Booker v. South Carolina Dept. of Corrections</u>, 855 F.3d 533, 537-538 (4th Cir. 2107) (citing <u>Henry v. Purnell</u>, 652 F.3d 524, 531 (4th Cir. 2011) (en banc)). The doctrine weighs the need to hold public officials accountable for irresponsible exercise of power against the need to shield officials from harassment, distraction, and liability when they perform their duties responsibly. <u>Booker</u>, 855 F.3d at 538 (citing <u>Pearson</u>, 555 U.S at 231).

In performing a qualified immunity analysis, a court must first determine the specific right that the plaintiff alleges was infringed by the challenged conduct. <u>Id.</u> (citing <u>Winfield v. Bass</u>, 106 F.3d 525, 530 (4th Cir. 1997) (en banc)). The court then must ask whether a constitutional violation occurred and whether the right violated was clearly established at the time the official violated it. The questions need not be asked in a particular order. <u>Id.</u> (citing

Melgar ex rel. Melgar v. Greene, 593 F.3d 348, 353 (4th Cir. 2010) and Pearson, 555 U.S. at 236). The plaintiff bears the burden of showing that a constitutional violation occurred, while the defendant bears the burden of showing entitlement to qualified immunity. Purnell, 501 F.3d at 377.

## III. Malicious Prosecution Under the Fourth Amendment

A malicious prosecution claim brought under § 1983 "is properly understood as a Fourth Amendment claim for unreasonable seizure which incorporates certain elements of the common law tort." Lambert v. Williams, 223 F.3d 257, 161-62 (4th Cir. 2000). To establish a malicious prosecution cause of action, a plaintiff must show that "the defendant (1) caused (2) a seizure of the plaintiff pursuant to legal process unsupported by probable cause, and (3) criminal proceedings terminated in plaintiff's favor." Evans v. Chalmers, 703 F.3d 636, 647 (4th Cir. 2012) (citing Durham v. Horner, 690 F.3d 183, 188 (4th Cir. 2012)). In this case, both criminal proceedings terminated in plaintiffs' favor. Therefore, the issues are limited to whether Williams caused the seizure of plaintiffs and if so, whether he had probable cause to pursue legal process against them.

### A. Causation

The parties focus their arguments on whether Williams had probable cause to seek the arrest warrants on the dog theft charges and the obstruction of justice charges. However, before addressing the issue of probable cause, the court believes it needs to address the first prong of the § 1983 malicious prosecution analysis: whether Williams caused the issuance of the arrest warrants for McKinny and Shrewsbury.

18

Plaintiffs must establish both but-for and proximate causation. Evans, 703 F.3d at 647. Subsequent acts of independent decision-makers such as prosecutors, grand juries, and judges, "may constitute intervening superseding causes that break the causal chain between a defendant-officer's misconduct and a plaintiff's unlawful seizure." Id. See also Rhodes v. Smithers, 939 F.Supp. 1256, 1274 (S.D.W.V. 1995) ("[W]here an officer presents all relevant probable cause evidence to an intermediary, such as a prosecutor, a grand jury, or a magistrate, the intermediary's independent decision to seek a warrant, issue a warrant, or return an indictment breaks the causal chain and insulates the officer from a section 1983 claim based on lack of probable cause for an arrest or prosecution.")

Such intervening acts may limit an officer's liability, but even when a prosecutor retains all discretion to seek an indictment, an officer may be found to have caused the seizure and remain liable to a wrongly indicted defendant if the officer lied to or mislead the prosecutor. Evans, 703 F.3d at 647. (citations omitted). "Stated differently, a police officer is not liable for a plaintiff's unlawful seizure following indictment 'in the absence of evidence that [the officer] mislead or pressured the prosecution.'" Id. at 648 (quoting Wray v. City of New York, 490 F.3d 189, 195 (2d Cir. 2007)). See also Snider v. Lee, 584 F.3d 193, 206 (4th Cir. 2009) (Stamp, J. concurring) ("A law enforcement officer who presents all relevant probable cause evidence to a prosecutor, a magistrate, or other intermediary is insulated from a malicious prosecution claim where such intermediary makes an independent decision to pursue prosecution or issue a warrant, . . . unless the officer concealed or misrepresented facts or brought such undue pressure to bear on the intermediary that the intermediary's independent judgment was overborne.")

In this case, Williams presented evidence both to Commonwealth's Attorney Stein and to a neutral magistrate. Stein testified at his deposition that he made the decision to have the dog theft arrest warrants issued:

**Question (by McKinney's attorney):** So, for whatever reason, the grand jury did not return an indictment, so then you have a decision to make, correct, as prosecutor?

**Answer (by Stein):** Yes, sir.

**Question:** That decision is whether to go forward somehow or drop the charges?

**Answer:** Yes, sir.

**Question:** Did you make the decision to go forward?

**Answer:** I did.

**Question:** And in what form?

**Answer:** A decision was made, rather than to wait for three months for another grand jury, to go ahead and proceed by warrant.

**Question:** You made that decision, correct?

**Answer:** Yes, sir.

**Question:** All right.

(An off-the-record discussion was held.)

**Question:** When you made that decision, what did you do to effect that decision?

**Answer:** I discussed it with Investigator Williams.

**Question:** And did you instruct him to do or not do something?

**Answer:** I don't know that I did not instruct him. Officer Williams and I discussed proceeding by warrant rather than waiting for another grand jury.

(Stein Depo. at 34-35; ECF No. 63-4 at 11).

It is clear from this exchange that Commonwealth's Attorney Stein made the decision to obtain the arrest warrants. In addition, McKinney has not alleged and there is no evidence in the record to support a finding that Williams mislead Stein in any way regarding the facts surrounding the incident, or that he mislead, or concealed exculpatory evidence from the magistrate judge who issued the arrest warrants.

McKinney argues that Stein "distanced himself" from the decision to charge and prosecute the warrants, and stated that he did not direct the issuance of the warrants, citing to Stein's deposition at pages 13, 53-54. (ECF No. 63-4 at 5, 16). However, the discussion about issuing warrants referred to the search warrants and not the arrest warrants on the dog theft. And while Stein said that he did not direct the investigation of the dog theft charges, he stated clearly that he made the decision to have the arrest warrants issued on the dog theft charges.

Regarding the issuance of the obstruction of justice misdemeanor warrants, Stein testified that he had more than one discussion with Williams regarding the warrants. Stein stated:

> There had been a series—my recollection is a series of communications between him and Heather Tucker where she was basically—her coming forward and her willingness to be subpoenaed and going to give evidence in the felony case was—she was having problems at work that was directly related to that. She was expressing that to Officer Williams. At some point, it was appearing that he should—to have a magistrate determine whether there was probable cause and that was an obstruction of justice.

(Stein Depo. at 71; ECF No. 63-4 at 20). Once again, Stein agreed that the facts of the obstruction allegations should be presented to a neutral magistrate, which Williams did, and the magistrate issued the warrants. (Stein Depo. at 71, ECF No. 63-4 at 20).[6]

The court finds that defendant Williams did not cause the either the dog theft or the obstruction of justice warrants to be issued. Rather, Stein and the magistrate caused the warrants to be issued and thus, Williams is insulated from McKinney's malicious prosecution cause of action based on the arrest warrants for dog theft.

In the alternative, even if Williams caused the issuance of the warrants, the court finds that he is entitled to qualified immunity on plaintiffs' causes of action, because, as discussed below, it was objectively reasonable for him to seek the warrants.

### B. Probable Cause

Regarding probable cause, it "is not a high bar." Kaley v. United States, 571 U.S. 320, 338 (2014). Probable cause "deals with probabilities and depends on the totality of circumstances." Maryland v. Pringle, 540 U.S. 366, 371 (2003). "It is 'a fluid concept' that is 'not readily, or even usefully, reduced to a neat set of legal rules.'" District of Columbia v. Wesby, 138 S.Ct. 577, 586 (2018) (quoting Illinois v. Gates, 462 U.S. 213, 232 (1983)). Probable cause "'requires only a probability or substantial chance of criminal activity, not an actual showing of such activity.'" Wesby, 138 S.Ct. at 586 (quoting Gates, 462 U.S. at 243-244, n. 13). Probable cause requires more than a bare suspicion, but less than that evidence needed to

---

[6] In addition, Stein represented the Commonwealth in the preliminary hearing on the dog theft charges and in the bench trial on the obstruction of justice charges. Had he not believed there was probable cause to move forward, he could have declined to prosecute. Instead, he argued forcefully at both hearings on behalf of the Commonwealth.

convict. Spivey v. Norris, 731 F. App'x 171, 175-176 (4th Cir. 2018) (citing United States v.

Gray, 137 F.3d 765, 769 (4th Cir. 1998)).

> "Probable cause" to justify an arrest means facts and circumstances within the officer's knowledge that are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense. In determining whether probable cause exist[s], we look to two factors: the suspect's conduct as known to the officer, and the contours of the offense thought to be committed by that conduct. Probable cause is an objective inquiry. [W]e examine the facts within the knowledge of arresting officers to determine whether they provide a probability on which reasonable and prudent persons would act; we do not examine the subjective beliefs of the arresting officers to determine whether they thought the facts constituted probable cause.

Spivey, 731 F. App'x at 176 (internal citations and quotations omitted) (emphasis in original).

Officers are not entitled to qualified immunity when they are plainly incompetent or

knowingly violate the law. Rogers v. Pendleton, 249 F.3d 279, 286 (4th Cir. 2001) (citing Malley

v. Briggs, 475 U.S. 335, 341 (1986)). "But in gray areas, where the law is unsettled or murky,

qualified immunity affords protection to an officer who takes an action that is not clearly

forbidden—even if the action is later deemed wrongful." Id. (citing Maciarello v. Sumner, 973

F.2d 295, 298 (4th Cir. 1992)). In addition, even if an officer's efforts could have been more

thorough, or if his actions may have been mistaken, it does not necessarily follow that the

actions were unreasonable. Wadkins v. Arnold, 214 F.3d 535, 543 (4th Cir. 2000).

With regard to the dog theft warrants, Under Virginia Code § 18.2-97, larceny of a dog

is a Class 5 felony. "Larceny" is "the taking and carrying away of the goods and chattels of

another with intent to deprive the owner of the possession thereof permanently." Lund v.

Commonwealth, 217 Va. 688, 691, 232 S.E.2d 745, 748 (1977). "Conspiracy" is defined in

relevant part as conspiring, confederating, or combining with another to commit a felony. Va. Code § 18.2-22.

Williams argues that he had probable cause to seek the arrest warrants on the dog theft and conspiracy to commit dog theft charges. He asserts that the information he developed in his investigation met the standards for the offenses, namely that even though Pritt's dog was at the shelter, the staff told Pritt that he was not there on instructions from McKinney and Lawrence. In addition, McKinney was arranging to send the dog out of Alleghany County.

McKinney counters that the dog did not have a collar or other identification and under Va. Code § 2.2-6546(D), the dog became the property of the shelter on May 6, 2017, which was five days after the dog arrived at the shelter. She argues that "a simple reading of the statutes" would have showed Williams that he did not have probable cause to seek the warrants. McKinney also argues that she could not have stolen the dog because she did not take or carry it anywhere.

Whether Williams had probable cause based on the facts in this case is a close call and construing the facts in McKinney's favor, it will be assumed that probable cause did not exist for issuance of the warrants. Nevertheless, where "a prosecutor and a neutral and detached magistrate independently reviewed the evidence and concluded that there was probable cause . . . [a] reasonable officer would not second-guess these determinations unless probable cause was plainly lacking . . . ." Id. (citing Wadkins, 214 F.3d at 543 and Torchinsky v. Siwinski, 942 F.2d 257, 262 (4th Cir. 1991)). See Wadkins, 214 F.3d at 541 ("Detective Arnold's conference with the Commonwealth Attorney and the subsequent issuance of the warrants by a neutral and detached magistrate weigh heavily toward a finding that Detective Arnold is immune.")

24

(emphasis in original); Torchinsky, 942 F.2d at 262 ("When a police officer protects a suspect's rights by obtaining a warrant from a neutral magistrate, the officer should, in turn, receive some protection from suit under 42 U.S.C. § 1983."); Gomez v. Atkins, 296 F.3d 253, 264-265 (4th Cir. 2002) (noting that in an assessment of objective reasonableness it is significant that an officer arrested a defendant only after first seeking and procuring the approval of a detached district court magistrate as this was a proper course of action); Mallory v. Holdorf, No. 3:11-03295-MBS, 2012 WL 4479070, *9 (D.S.C. 2012) ("[A]n objectively reasonable police officer would have believed that he could rely on the judgment of a veteran prosecutor in addition to a county magistrate, who both concluded that probable cause existed.")

Probable cause in this case was not "plainly lacking." Williams had information that McKinney instructed shelter staff to tell the owner of a dog that the dog was not at the shelter when it in fact was at the shelter. Williams reported the information to Stein and made the decision to seek the warrants after Stein decided to proceed on the warrants. In addition, there is no allegation that Williams was untruthful with either the Commonwealth's Attorney or the magistrate when he discussed the facts of the dog theft case with them. A reasonable officer in his position would rely on the advice of the Commonwealth's Attorney and the decision of the magistrate in issuing the warrants. Thus, the court finds that under the facts related to the dog theft warrants, Williams is entitled to qualified immunity.

On the obstruction of justice warrants, plaintiffs claim that the law in Virginia is clear and that a reasonable officer in Williams's place would have known that probable cause did not exist to support warrants for either Shrewsbury or McKinney on those charges. "Obstruction of justice" is defined in Va. Code § 18.2-460 (A) as follows:

> If any person without just cause knowingly obstructs a judge, magistrate, justice, juror, attorney for the Commonwealth, witness, any law-enforcement officer, or animal control officer . . . in the performance of his duties as such or fails or refuses without just cause to cease obstruction when requested to do so . . . , he is guilty of a Class 1 misdemeanor.

Plaintiffs cite <u>Rogers</u>, which addresses obstruction of justice in the context of a police officer performing his duties. In that case, the Fourth Circuit found that an officer was not entitled to qualified immunity when he arrested Rogers for obstruction of justice because Rogers "stepp[ed] in front of him" and "got in his face" when officers conducted a search. The officer testified that he simply stepped around Rogers and then stood without interference for a time while observing Rogers speaking to another officer. <u>Rogers</u>, 249 F.3d at 291. The court found that § 18.2-460(A) clearly permitted purely verbal resistance to a plainly unlawful search and found that the statute failed to encompass Rogers's behavior. Therefore, the court found that the officer was not entitled to qualified immunity on Roger's § 1983 claim. <u>Id.</u> at 294.

It is not clear that <u>Rogers</u> applies to plaintiffs' case because the facts are dissimilar. Shrewsbury and McKinney were accused of threatening an employee's job where the employee had the potential to either help or hurt their defense on the dog theft charges, rather than standing in front of a police officer who was attempting to search a property. <u>See</u> <u>Clem v. Corbeau</u>, 284 F.3d 543, 549 (4th Cir. 2002) ("If the right was not 'clearly established' in the 'specific context of the case'—that is, if it was not 'clear to a reasonable officer' that the conduct in which he allegedly engaged 'was unlawful in the situation he confronted'—then the law affords immunity from suit."(quoting <u>Saucier v. Katz</u>, 533 U.S. 194, 121 S.Ct. 2151, 2155 (2001)).

Nevertheless, the court again will construe the facts in McKinney's favor and assume that probable cause did not exist for issuance of the warrants. The uncontested evidence shows that Williams obtained the warrants after conferring with Stein and seeking the warrants from a neutral magistrate and plaintiffs have not alleged that Williams misrepresented the facts to either Stein or the magistrate judge. A prudent officer would have relied on Stein's opinion and the issuance of the warrants by the magistrate to conclude that he had probable cause to proceed with arresting plaintiffs.

Accordingly, the court finds that Williams is entitled to qualified immunity on the claims of malicious prosecution based on the obstruction of justice charges. For the above-stated reasons, Williams's motion for summary judgment is **GRANTED** and summary judgment is entered for Williams on plaintiff's Fourth Amendment malicious prosecution causes of action.

## IV. Pendent State Law Claims

Actions for malicious prosecution are not favored in Virginia. Reilly v. Shepherd, 273 Va. 728, 733, 643 S.E.2d 216, 218 (2007). "The requirements for maintaining such actions are more stringent than those applied to other tort cases, and are imposed to encourage criminal prosecutions in appropriate actions without fear of reprisal by civil actions, criminal actions being essential to the maintenance of an orderly society." Id., 273 Va. at 733, 643 S.E.2d at 218-219 (2007).

To make out a claim for malicious prosecution under Virginia law, a plaintiff must show that the prosecution was (1) malicious; (2) instituted by, or with the cooperation of, the defendant; (3) without probable cause; and (4) terminated in a manner not unfavorable to the

plaintiff. Davis v. Bacigalupi, 711 F.Supp.2d 609, 625 (E.D. Va. 2010) (citing Hudson v. Lanier, 255 Va. 330, 497 S.E.2d 471, 473 (1998)).

"Malice may be inferred from a lack of probable cause, but a lack of probable cause may not be inferred from malice." Reilly, 273 Va. at 733, 643 S.E.2d at 219. "Accordingly, it is appropriate to begin by considering whether the evidence was sufficient to support a finding of probable cause." Id.

"The necessary factual predicates for probable cause under federal law and Virginia law are essentially the same." King v. Darden, No. 3:17-cv-742, 2019 WL 1756531, *4 (E.D. Va. 2019) appeal docketed May 22, 2019. See Stanley v. Webber, 260 Va. 90, 96, 531 S.E.2d 311, 314 (2000) ("[P]robable cause is defined as knowledge of such facts and circumstances to raise the belief in a reasonable mind, acting on those facts and circumstances, that the plaintiff is guilty of the crime of which he is suspected.") Courts gauge probable cause by the facts known to the officer at the time legal proceedings are instituted. King, 2019 WL 1756531 at *4 (citing United States v. Al-Talib, 55 F.3d 923, 931 (4th Cir. 1995) and Howard v. Commonwealth, 210 Va. 674, 678, 173 S.E.2d 829, 833 (1970)).

However, even when probable cause does not exist, "[r]eliance upon advice of reputable counsel after full disclosure of all material facts provides a complete defense to an action for malicious prosecution, even if the attorney's advice is wrong." Andrews v. Ring, 266 Va. 311, 324, 585 S.E.2d 780, 787 (2003) (citing Noell v. Angle, 217 Va. 656, 660, 231 S.E.2d 330, 333 (1977)). Assuming that the facts known to Williams did not support a finding of probable cause on either the dog theft charges or the obstruction of justice charges, he

disclosed the facts known to him to Stein and was entitled to rely upon Stein's advice, even if the advice was wrong.

Construing the evidence in the light most favorable to McKinney, the court finds that Williams accurately relayed to Stein the information he had about the dog theft allegations and the obstruction of justice allegations and that it was reasonable for him to rely upon the advice of Stein in obtaining the warrants for both cases. Accordingly, the court enters summary judgment for Williams on the Virginia common law cause of action for malicious prosecution.

## V. Plaintiffs' Motion for Summary Judgment

In plaintiffs' cross-motion for summary judgment they argue that Williams did not have probable cause for issuance of the arrest warrants and that he is not entitled to qualified immunity. The above analysis applies to their motion as well, and their motion is therefore **DENIED** for the same reasons Williams's motion for summary judgment was granted.

## VI. Motion to Strike

Plaintiffs filed a motion to strike a declaration submitted by Williams with his reply to plaintiffs' response to Williams's motion for summary judgment. Because the court did not consider the declaration in its analysis of the cross-motions for summary judgment, the motion to strike is **DENIED as moot**.

## CONCLUSION

Based on the foregoing, defendant Williams's motion for summary judgment, ECF No. 54, is **GRANTED**. Plaintiffs Shrewsbury and McKinney's motion for summary judgment, ECF No. 56, is **DENIED**. Plaintiffs' motion to strike, ECF No. 67, is **DENIED as moot**. Summary judgment is entered for Williams's on all causes of action brought in this lawsuit.

An appropriate order will be entered.

It is so **ORDERED**.

Entered: 02 − 06 −2020

/s/ Michael F. Urbanski

Michael F. Urbanski
Chief United States District Judge